UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,                          :
                                                   :          __OPINION & ORDER__
                      -against-                     :
                                                   :          07-CR-543 (DLI)(SMG)
RUSSELL DEFREITAS,                                 :
         also known as "Mohammed,"                 :
KAREEM IBRAHIM,                                    :
         also known as "Amir Kareem"               :
         and "Winston Kingston,"                   :
ABDUL KADIR,                                       :
         also known as "Aubrey Michael Seaforth,"  :
AND ABDEL NUR,                                     :
         also known as "Compton Eversley,"         :
                                                   :
                      Defendants.                   :
-------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On June 28, 2007, defendants were each indicted for Conspiracy to Attack Public Transportation System, Conspiracy to Destroy Building by Fire or Explosive, Conspiracy to Attack Aircraft and Aircraft Materials, Conspiracy to Destroy International Airport Facilities, and Conspiracy to Attack Mass Transportation Facility, in violation of 18 U.S.C. §§ 2332f(a)(1), 844(i), 32(a)(2), 37(a)(2), 1992(a)(4)(B), and 3551 *et seq*. Defreitas and Kadir were also indicted for Surveillance of Mass Transportation Facility, in violation of 18 U.S.C. § 1992(a)(8) and 3551 *et seq*.

Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Defreitas moves to suppress evidence seized from his residences in Brooklyn, New York, and Georgetown, Guyana.[1] Kadir moves to suppress evidence seized during his arrest in Trinidad, as well as evidence seized during subsequent searches of a third-party residence in Trinidad and of Kadir's

---

[1] Defreitas also moves to suppress statements made at the time of his arrest. The court denied this motion from the bench at a suppression hearing on March 23, 2010.

1

own residence in Linden, Guyana. Finally, Nur moves to suppress a statement he made in the course of his Trinidadian extradition proceedings. All defendants request leave to join in each others' motions to the extent they are applicable and beneficial. For the reasons set forth below, defendants' motions are denied, except to the extent that the court has deferred ruling on the scope of the search of Defreitas' Brooklyn apartment pending receipt of additional evidence.[2]

## I.  BACKGROUND

The charges in the indictment all stem from the same general allegation that defendants conspired to attack John F. Kennedy International Airport ("JFK") in Queens, New York, by exploding fuel storage tanks. In preparation for this attack, the government alleges that defendants "performed physical surveillance, made video recordings [and located satellite images on the internet] of JFK . . . and its buildings and facilities . . . and sought expert advice, financing and explosives." (Gov't Mem. in Opp'n to Mots. to Suppress ("Opp'n") 2.)

Following an investigation that began in early 2006, the government obtained an arrest warrant for all four defendants on June 1, 2007 from the Honorable Steven M. Gold, Chief United States Magistrate Judge of this district. (First Aff. of Robert Addonizio in Opp'n to Mots. to Suppress ("Addonizio Aff.") 2–3.) That same day, Russell Defreitas, a naturalized U.S. citizen, was arrested in New York. (*Id.* at 7.) Abdul Kadir, a citizen of Guyana, also was arrested on June 1, at Piarco International Airport in Trinidad and Tobago, pursuant to a provisional arrest warrant issued by a local magistrate. (Opp'n 14; *see also* Kadir Mot. Ex. E.) The

---

[2] At oral argument on February 19, 2010, the court ruled from the bench on Ibrahim's motion for advance notice of prior bad act evidence falling under Fed. R. Evid. 404(b). (*See* Tr. 92 (ordering government to provide such notice by May 3, 2010).) Additionally, Kadir, Ibrahim and Nur each move to preclude the use of each others' extradition statements against them, or, alternatively, for severance of their trials pursuant to Federal Rule of Criminal Procedure 14(a). Ibrahim and Kadir also move for severance on "spillover" grounds. The court is currently reviewing the statements and will issue a decision as to suppression and severance in due course.

Trinidadian warrant was based on the arrest warrant issued by Chief Magistrate Judge Gold. (Opp'n 14; *see also* Kadir Mot. Ex. F.) Trinidadian officers conducted a search of his person incident to this arrest, and later searched his luggage pursuant to a local search warrant. (Opp'n 2–3.)

On June 2, 2007, Kareem Ibrahim, a Guyanese citizen, also was arrested in Trinidad and Tobago.[3] The same day, Trinidadian law enforcement officials obtained a warrant to search a third-party residence in connection with Kadir's arrest. (Kadir Mot. Ex. G.) This warrant stated, in relevant part, that "there is reasonable ground for believing that Trinidad and Tobago Passports [sic] and documents which will afford evidence as to the commission of an indictable offense namely conspiracy to commit a terrorist act . . . [a]re concealed on the premises of Khalid Hassan . . . ." (*Id.* Ex. G, 1.) The Trinidadian officials executed the warrant the same day, seizing Kadir's Guyanese passport as well as a number of other banking and travel documents. (*Id.* Ex. G, 2–3.)

On June 3, 2007, Guyanese law enforcement officers executed a search warrant at Kadir's residence in Linden, Guyana. The warrant stated that there was reason to suspect the presence of "firearms ammunition and related documents" on the premises. (Kadir Mot. Ex. A, 2.) The evidence seized on this date consisted mainly of magazines, newspapers, cards, and books. (*See id.* at 3.)

On June 6, 2007, Guyanese officers executed a warrant to search Defreitas' residence in Georgetown, Guyana. (Defreitas Mot. Ex. G.) This warrant was issued pursuant to a Guyanese law enforcement affidavit that stated, in relevant part, "there is reason to suspect that . . .

---

[3] The fourth and final defendant, Abdel Nur, surrendered to Trinidadian officials on June 5, 2007. Like Kadir and Ibrahim, Nur is a Guyanese citizen.

[Defreitas] has in his premises . . . firearms, ammunition, [and] explosives . . . ." (*Id.* Ex. F.) The affidavit did not, however, expressly indicate the basis for this belief.

On June 7, Guyanese officers, this time accompanied by agents of the U.S. Joint Terrorism Task Force ("JTTF"), conducted a second search of Kadir's residence, pursuant to a different Guyanese warrant. (*See* Addonizio Aff. 4–5.) As with the earlier search of Kadir's residence, this second search targeted "firearms ammunition and related documents." (Kadir Mot. Ex. B, 2.) Among the items seized were passports, diaries, audio cassettes, and floppy disks. (*See id.* at 3. *See generally id.* Ex. C.) Also seized were two computer hard drives, which the Guyanese officers turned over to the JTTF agents who, in turn, shipped them to New York. There, "in an abundance of caution," the JTTF sought a separate warrant to search them. The warrant was issued by the Honorable Joan M. Azrack, United States Magistrate Judge of this district, on July 5, 2007. (*See* Opp'n 24–25; *see also* Kadir Mot. Ex. D (setting forth the specific information sought from the hard drives).)

On August 6, 2007, extradition proceedings commenced in Trinidad and Tobago against Ibrahim, Kadir, and Nur, pursuant to a treaty between that country and the United States. The government participated in these proceedings. (Nur Mot. 4.) After extradition was granted, all three requested habeas relief from the Trinidadian courts, which was denied. (*See generally id.* Ex. D.) In the course of the habeas proceedings, Ibrahim, Kadir and Nur each filed a notarized statement with the Trinidadian court. (Nur Mot. 2.) All four defendants are currently in the custody of the U.S. government.

On February 28, 2008, the Honorable Lois Bloom, United States Magistrate Judge of this district, issued a warrant to search Defreitas' apartment in Brooklyn, New York. (*See* Addonizio Aff. Ex. G; Defreitas Mot. Exs. D, E.) According to the government, Defreitas had resided there

at various times between January 2007 and June 2007. (Addonizio Aff. 6.) The apartment is owned by New York City, and was provided to Defreitas "by a confidential source working under the direction of the JTTF." (*Id.* at 6–7.) When Defreitas was arrested on June 1, 2007, the government locked the apartment, which was then inaccessible to anyone. (*Id.* at 7.) The government maintains that the JTTF executed the search warrant on March 5, 2008, although "the agents inadvertently failed to write the execution date on the warrant itself." (Addonizio Aff. 7.) The agents seized a number of items, inventorying "both the evidence and the remaining personal property;" the latter "remains available for pick-up by a representative of Defreitas." (*Id.*; *see also id.* Ex. H (listing items taken from apartment); Defreitas Mot. Ex. D, 3–4 (same).)

## II.     DISCUSSION

### A.     Defreitas' Motion to Suppress

#### 1.     Staleness of the Brooklyn Warrant

Defreitas moves to suppress the items taken from his Brooklyn apartment on the ground that the information forming the basis of the search warrant was stale.[4] Specifically, he notes that that the government source reported seeing incriminating items on May 7, 2007, but the apartment was not secured by the government until June 1, 2007 and not searched until March 2008. At oral argument, the government explained, "there was a feeling initially that there was a lot of work to do and pressing matters to take care of and that this apartment was under lock and key, wasn't going anywhere. Then it was a matter of oversight for a period of months." (Tr. 46.)

---

[4] (Defreitas Mot. 5; *see also id.* Ex. E, 6.) In his motion papers, Defreitas also argued for suppression on the ground that the JTTF's failure to note the warrant's execution date indicates a failure to conduct the search within ten days of the warrant's issuance, as required by Federal Rule of Criminal Procedure 41. (Defreitas Mot. 6.) The government concedes that its agents neglected to specify the date of execution on the warrant. It proffers, however, that the search occurred on March 5, 2008. (Addonizio Aff. 7.) Defreitas did not contest this proffer at oral argument, and the court accepts it. Accordingly, as the error was ministerial, not substantive, the motion is denied.

As an initial matter, the court notes that a "magistrate's finding of probable cause is entitled to substantial deference." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citations omitted). Furthermore, "in close cases . . . doubts should be resolved in favor of upholding the warrant." *Id.* (citations omitted). In evaluating whether the information that formed the basis of probable cause was stale, a court "consider[s] the age of the facts in light of the conduct at issue with a view toward ensuring that probable cause exists at the time the warrant is to be executed, not simply at some past time." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) (citations omitted). When the conduct at issue is "continuing . . . as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the application becomes less significant." *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (citations and internal quotation marks omitted). The nature of the evidence being sought is also relevant to a staleness analysis. *See United States v. McGrath*, 622 F.2d 36, 42 (2d Cir. 1980) (affirming validity of warrant for "betting slips, notebooks, and other relatively permanent bookmaking paraphernalia").

The government alleges that Defreitas' involvement in the ongoing conspiracy was continuous between May 7, 2007 and his arrest on June 1, 2007, making the passage of time less significant during that three-week period. (*See* Addonizio Aff. 2–3.) The government further argues that the remaining period up to February 28, 2008 (when the warrant was signed) essentially should be tolled beginning on June 1, 2007, because the apartment was "locked and inaccessible" after that date. (*See* Opp'n 33–34.) Defreitas counters that such tolling would be inappropriate, and that absent proof that the apartment was *not* accessed, all seized evidence should be suppressed. (*See* Defreitas Reply 3.)

The items sought by the JTTF in its warrant application—bank account information, etc.—are the type of documents commonly kept for longer periods of time, weighing against a finding of staleness. (Defreitas Mot. Ex. E, 6); *see McGrath*, 622 F.2d at 42. This, combined with the allegation that Defreitas' involvement in the conspiracy continued between May 7, 2007 and his arrest on June 1, 2007, leads the court to find no staleness during that brief period. *See United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993); *Gallo*, 863 F.2d at 192. Regarding the period following his arrest during which the apartment was unoccupied, Defreitas essentially seeks to apply a chain-of-custody requirement applicable to evidence already in the government's possession. This is not the relevant standard. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (warrant requirement is "fair probability" that evidence will be found on premises). In the absence of any indication that the apartment *actually* was accessed during that period, the court has no reason to overturn the magistrate judge's probable cause finding on staleness grounds. *See United States v. Regan*, 706 F. Supp. 1102, 1116 n.17 (S.D.N.Y. 1989) (finding no staleness where warrant was issued to seize documentary evidence of conspiracy two years after transactions described in supporting affidavit, even though premises were *not* secured during that period).

## 2. Scope of the Brooklyn Warrant

While the court holds that the search warrant was not stale, the executing agents were still bound by its scope. *See Horton v. California*, 496 U.S. 128, 140 (1990). In interpreting a warrant's scope, agents "have some discretion" and their interpretation should be "commonsensical," not "hyper-technical." *United States v. Salameh*, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999), *aff'd*, 16 Fed. Appx. 73 (2d Cir. 2001); *see also United States v. Catapano*, 2008 WL 3992303, at *3 (E.D.N.Y. Aug. 28, 2008) (noting that a broad interpretation of a

search warrant as directed by *Salameh* is proper as it "provid[es] the agents with the discretion necessary to reasonably conduct a search"). Even if agents exceed the scope of a warrant, "suppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (citations omitted). "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotation marks omitted).

The government concedes that some of the seized items were outside the scope of the warrant (including a book on chess and documents related to public benefits), but states that they were "removed . . . from the residence and inventoried for safekeeping because Defreitas no longer resided [there]." (Opp'n 35.) It further proffers that these items "remain[] available for pick-up by a representative of Defreitas." (Addonizio Aff. 7.) The government does not address other items that Defreitas contends to be outside the scope of the warrant, such as a Quran and a biography of Fatimah Zahra, except to state that they "may be relevant to rebut . . . Defreitas' claim . . . that he is illiterate."[5] Defreitas requests a breakdown by the government of which items were seized pursuant to the warrant and which were simply seized for safekeeping, contending that the court cannot rule on whether the scope of warrant was exceeded without such a list. (*See* Defreitas Reply 3.) The court agrees. Accordingly, the court defers ruling on this prong of Defreitas' motion and directs the government to prepare such a list to be filed no later than March 30, 2010.

---

[5] (Opp'n 35 n.3.) The question of Defreitas' literacy was not addressed at the suppression hearing held on March 23, 2010.

B.    **Kadir's Motion to Suppress**

1.    **Applicability of Fourth Amendment to Non-Citizens**

Kadir is not a U.S. citizen, and has no voluntary connections to the United States. It is well settled that the Fourth Amendment is inapplicable to persons so situated, who are searched outside of the country. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990); *see also In re Terrorist Bombings*, 552 F.3d at 167 n.5. Thus, with respect to the searches and seizures conducted in Trinidad and Tobago and Guyana, an exclusionary remedy is unwarranted.[6] Despite this concededly dispositive case law, Kadir belatedly argues that dicta in the final sentence of *Verdugo-Urquidez* operates to keep this inquiry open a while longer.[7] According to Kadir, this language means that "the court must examine the [extradition] treaty invoked [by the government]." (Kadir Reply 2.) Notably, Kadir provides no analysis of the treaty in question, or of how the acts by the law enforcement officials may have violated the treaty, despite its being readily available. (*See* Tr. 87.)

To the extent Kadir is arguing that *Verdugo-Urquidez* requires that foreign "searches and seizures which occur incident to . . . American action" comply with restrictions created by existing treaties, the court is unaware of any such restrictions in the treaty in question. 494 U.S. at 275. In any case, Kadir has made no indication of how the searches or seizures might have failed to comply with this treaty. To the extent Kadir is challenging the extradition itself as a basis for suppression, the court has examined the opinion of its Trinidadian counterpart and finds

_____

[6] The court also notes that, as with Defreitas, there is no indication of any action on the part of foreign law enforcement officials that would "shock the conscience." *See* Part II.A.2.a, *supra*.

[7] *See* 494 U.S. at 275 ("If there are to be restrictions on searches and seizures which occur incident to . . . American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation."). This argument was raised for the first time in Kadir's Reply brief.

its ruling upholding extradition and rejecting defendants' habeas petitions to be thorough, well-reasoned and well-supported. (*See generally* Nur Mot. Ex. D.) In sum, *Verdugo-Urquidez* bars the application of the Exclusionary Rule to any of the evidence against Kadir seized abroad, and nothing in its dicta persuades the court to hold otherwise.

### 2. Agency and Fourth Amendment Reasonableness

Even if the court were to find that *Verdugo-Urquidez* was inapplicable, suppression of the evidence against Kadir still would be unwarranted. As a general rule, "information furnished American officials by foreign police need not be excluded simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975). The reason for this is that "[t]he exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation. Since it has little if any deterrent effect upon foreign police, it is seldom used to bar their work product." *Id.* (citations omitted). In fact, the Second Circuit has recognized only "two circumstances where evidence obtained in a foreign jurisdiction may be excluded." *United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992). The relevant circumstance is "where cooperation with foreign law enforcement officials may implicate constitutional restrictions."[8] This can occur in two situations: "(1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Id.*

---

[8] *Id.* at 61. The other circumstance where evidence obtained in a foreign jurisdiction may be excluded, which is inapplicable here, is "where the conduct of foreign officials in acquiring the evidence is so extreme that they shock the judicial conscience." *Id.* at 60 (citation and internal quotation marks omitted).

In *United States v. Paternina-Vergara*, the Second Circuit noted that "[t]he investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that . . . such cooperation would constitute the foreign officials as agents of the United States." 749 F.2d 993, 998 (2d Cir. 1984). Using this as its starting point, the Circuit in *Maturo* upheld a finding that Turkish law enforcement officers were not acting as U.S. agents when they wiretapped the phones of a suspect under investigation by the U.S. Drug Enforcement Agency. *See* 982 F.2d at 61–62. Crucial to this decision was the lack of any evidence that "the DEA was . . . involved in the decision to seek a wiretap." *Id.*

Here, there is no evidence that the U.S. was involved in the decision to execute any of the Trinidadian searches,[9] or in the decision to execute the first search of Kadir's Guyanese residence. Thus, applying *Maturo*, the court cannot conclude that there was agency on the part of either the Trinidadian or Guyanese officials with respect to those searches. *See id.* at 61. Similarly, there is no evidence of any cooperation between the United States and those countries during those searches, let alone evidence of cooperation "designed to evade constitutional requirements." *Id.* As neither of the *Maturo* exceptions apply, the evidence against Kadir seized during those searches by foreign law enforcement officers cannot be excluded.

The second search of Kadir's Guyanese residence requires no *Maturo* analysis, as it was conducted, at least in part, by U.S. law enforcement personnel. However, the Second Circuit has held that such foreign searches "are subject only to the Fourth Amendment's requirement of reasonableness." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 171

---

[9] Kadir also has no standing to contest the search of Khalid Hassan's Trinidadian residence, and his motion to suppress the fruits of that search is therefore denied. *See United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005) (finding no Fourth Amendment standing where defendant neither demonstrated "that he owned the premises [n]or that he occupied them and had dominion and control over them by leave of the owner") (citations omitted).

(2d Cir. 2008); *see also id.* (holding that "the Fourth Amendment's Warrant Clause has no extraterritorial application"). "To determine whether a search is reasonable under the Fourth Amendment, [a court] examine[s] the 'totality of the circumstances' to balance . . . 'the degree to which it intrudes upon an individual's privacy [against] the degree to which it is needed for the promotion of legitimate government interests.'" *Id.* at 172 (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). Factors weighing on intrusiveness include whether a search was conducted in a person's home, pursuant to a warrant, the time the search occurred, the scope of the search, the presence of third parties, and whether an inventory of the items seized was taken and turned over to the third party. *See In re Terrorist Bombings*, 552 F.3d at 173–74. These factors must be balanced against "the self-evident need to investigate threats to national security presented by foreign terrorist organizations." *Id.* at 175.

Here, as in the Kenyan search upheld in *In re Terrorist Bombings*, the intrusion into Kadir's home "was minimized by the fact that the search was not covert"—*i.e.*, it was conducted pursuant to a local warrant. (*See* Addonizio Aff. Ex. D, 4.) The intrusion was further minimized by the presence of Kadir's family members (*see* Addonizio Aff. ¶ 5), the fact that the search was conducted in the daytime (*see id.* Ex. D, 7), and the fact that the officers made an inventory of the items seized.[10] Weighing against this limited intrusion is "the government's manifest need to investigate possible threats to national security." *In re Terrorist Bombings*, 552 F.3d at 174. Given the government's basis for the search—that it was acting to break up a conspiracy aimed at attacking JFK, whose members were actively trying to obtain explosives in order to carry out this attack—there can be no doubt that the balance of the relevant factors weighs in favor of a

---

[10] (Addonizio Aff. Ex. D, 5–6.) The record is unclear as to whether this inventory was turned over to the third party family members, as was done in *In re Terrorist Bombings*. *See* 552 F.3d at 174.

finding of reasonableness here. Accordingly, the court finds that the second search of Kadir's Guyanese residence passes Fourth Amendment muster, and the motion to suppress the fruits of said search is denied.

### 3. Search of Computer Hard Drives

In contrast to the searches conducted on foreign soil, the hard drives seized from Kadir's Guyanese residence were searched in the United States. As such, Kadir implicitly argues that *Verdugo-Urquidez* cannot bar application of the Fourth Amendment.[11] Assuming this is so, he moves to suppress the fruits of this search on the ground that "the warrant itself and the search were overly broad." (Kadir Mot. 12.) Specifically, he contends that, to satisfy the Fourth Amendment, the government should have "delineate[d] which files were appropriate to be searched." (*Id.*)

"The Fourth Amendment . . . specifies only two matters that must be 'particularly described' in [a] warrant: 'the place to be searched' and 'the persons or things to be seized.'" *United States v. Grubbs*, 547 U.S. 90, 97 (2006). Regarding the former, the warrant specified, by serial number, the two hard drives that were to be searched, and identified the computer from which the hard drives were taken by its serial number. (Addonizio Aff. Ex. E, 11–12.) Such specificity is more than sufficient to survive the instant challenge. Accordingly, the only

---

[11] *See* 494 U.S. at 274–75 (declining to apply Fourth Amendment in part because "the place searched was located in Mexico"). The issue of the applicability of *Verdugo-Urquidez* to items seized abroad but searched in the United States has not been squarely addressed in any Circuit or the United States Supreme Court, and it is unclear whether a warrant was required once the JTTF agents decided to search the hard drives in the United States. However, it would seem incongruous to hold that *Verdugo-Urquidez* applied during the initial seizure in Guyana, and then became inapplicable *to the same evidence* once it was brought into this country. The court therefore denies Kadir's motion on this ground, in addition to those set forth *infra*. The court further notes that, when the JTTF agents obtained the warrant to search the hard drives out of "an abundance of caution," the purpose of the Fourth Amendment—the prevention of unreasonable warrantless searches—was satisfied. Accordingly, suppression of the evidence from this search would serve no deterrence function.

remaining inquiry is whether the warrant particularly described the "things to be seized." *See Grubbs*, 547 U.S. at 97.

With respect to computers, particularity as to "the things to be seized" does not require that the warrant identify the actual names of the targeted files. *See, e.g.*, *United States v. Vilar*, 2007 WL 1075041, at *37 (S.D.N.Y. Apr. 4, 2007); *United States v. Coye*, 2002 WL 31526542, at *4 (E.D.N.Y. Nov. 14, 2002); *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002). The reason is clear: "Computer records searches are no less constitutional than searches of physical records, where innocuous documents may be scanned to ascertain their relevancy." *United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998); *see also id.* at 582 (noting "the reality that few people keep documents of their criminal transactions in a folder marked 'crime records'") (quoting *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990)). Here, the warrant in question authorized the seizure of "files, documents, satellite image software, satellite images, video software, video clips, photographs and other related information, all of which are related to conspiring to providing material support to terrorists and conspiring to kill or injure persons or damage or destroy property in a foreign country," which was consistent with the evidence uncovered during the investigation. (Addonizio Aff. Ex. E, 11–12.) By thus "authoriz[ing] only the seizure of a relatively narrow range of items," in the context of the alleged crime, the court finds that the warrant was "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *See United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (citation omitted).

Even if the warrant was overly broad, suppression would be unwarranted here. The government had every right to search the hard drives in Guyana, where the search would have been subject only to a Fourth Amendment reasonableness analysis. *See In re Terrorist Bombings*,

552 F.3d at 171 ("Warrant Clause has no extraterritorial application"). Instead, the government took the additional step of obtaining a warrant in the United States—precisely the type of conduct the exclusionary rule was intended to promote. *See United States v. Leon*, 468 U.S. 897, 922–24 (1984) (applying "good faith exception" to exclusionary rule upon a detailed analysis of the purposes of the Fourth Amendment's warrant requirement). For all of the reasons set forth above, Kadir's motion to suppress evidence from the hard drives is denied.

### C. Nur's Motion to Suppress

"'[T]he Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.'" *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)). Deliberate elicitation, in turn, "covers only those statements obtained as a result of an intentional effort on the part of government officials to secure incriminating statements from the accused." *Rommy*, 506 F.3d at 135 (citations and internal quotation marks omitted). Examples of such intentional efforts include questions intended "to stimulate discussion, to lead the conversation into any particular subject, or to prompt any particular replies beyond what [a defendant] himself had volunteered." *Rommy*, 506 F.3d at 136 (citing *United States v. Henry*, 447 U.S. 264, 271 n.9 (1980) (internal quotations omitted)). "There is no deliberate elicitation if the [government] passively listen[s], or if a suspect volunteers statements." *United States v. Theriault*, 2008 WL 942568, at *3 (N.D.N.Y. Apr. 7, 2008) (citation omitted). "[C]lassic situations where the Sixth . . . Amendment protections apply [include] where police engage a person not in custody whose . . . right to counsel has attached, or where a prison informant somehow importunes a defendant to make incriminating statements." *Rommy*, 506 F.3d at 136.

Notwithstanding the fact that he was represented by Trinidadian counsel during his extradition, Nur contends that the statements he made in opposition to this extradition (*see generally* Nur Mot. Ex. A) should be suppressed as a violation of his Sixth Amendment right to *U.S.* counsel. (*See* Nur Mot. 2.) Essentially, he argues that the government's filing of the indictment was a "deliberate" act that triggered his extradition proceedings, which "elicited" from him the statements in question. If the government intended to use these statements against him, Nur argues that it should have provided U.S. counsel during the extradition proceedings. (*See* Tr. 71–72.)

This argument is unpersuasive for two reasons. First, Nur cites no legal authority to support his proposition that only *U.S.* counsel is capable of providing Sixth Amendment protection. Indeed, Trinidadian attorneys are presumably well-versed in the right against self-incrimination and the right to counsel, given that both are enshrined in that country's constitution. *See* CONSTITUTION OF THE REPUBLIC OF TRIN. & TOBAGO ch. 1 art. 5 § 2(d).

Second, it is clear from the record that Nur made his statements voluntarily in order to contest his extradition, and not in response to any attempts by any law enforcement authorities to elicit information. (*See* Nur Mot. Ex. A, 9–10; Opp'n 43.) While Nur notes that "the very Assistant United States Attorneys who [are] active before this Court were also actively participating in the extradition proceedings in Trinidad," (Nur Mot. 4), he does not allege that these attorneys even conversed with him, let alone questioned him outside the presence of counsel. *Contra Rommy*, 506 F.3d at 131 ("Unrefuted record evidence demonstrates that Rommy himself requested a meeting with DEA agents at the Madrid prison where he was incarcerated pending extradition to the United States."). Indeed, Nur tellingly failed to respond to the government's assertion that "[t]he only involvement we had [in the extradition and habeas

proceedings] was . . . responding to the Trinidadian lawyers for the Trinidadian government who asked from time to time for affidavits on particular points of relevance to the Trinidadian court." (Tr. 73–74.) To equate such minimal responsive involvement with the "deliberate elicitation" impermissibly performed by police interrogators or prison informants, which trigger Sixth Amendment concerns, is to distort the protections afforded by the Sixth Amendment beyond all recognition. Accordingly, the court declines to suppress the use of Nur's extradition and habeas statements against him.[12]

## III.    CONCLUSION

For the reasons set forth above, defendants' motions to suppress are granted only to the extent that the court defers ruling on the scope of the search of Defreitas' Brooklyn home pending the submission of additional evidence by the government and are denied in all other respects. The court will issue a ruling on defendants' motions to preclude the use of each others' extradition statements against them, or, in the alternative, to sever their trials, in due course.


SO ORDERED.

Dated: Brooklyn, New York
        March 24, 2010

_____
                                    /s/
                        DORA L. IRIZARRY
                        United States District Judge

---

[12] This ruling does not affect these defendants' pending *Crawford* and *Bruton* motions to preclude the use of their co-defendants' statements against *them*.