**TONI MESSINA, Esq.**
**100 Lafayette Street, Suite 502**
**New York, NY 10013**

**11.30.10**

The Honorable Judge Dora Irizarry
U. S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York

## PRE-SENTENCE LETTER

**In Re: <u>U.S.A. v. Abdul Kadir</u>, 07 CR 543**

Dear Judge,

This letter is written to help the court determine the appropriate sentence for Abdul Kadir in keeping with the mandates of 18 USC 3553(a). It will review his personal history, his role as a Parlimentarian and leader in his home country, Guyana, the context of this crime and his minor role therein, comparative sentences of other defendants in the U.S. convicted of terrorist crimes and will argue against the 40 years recommended by the Department of Probation.

### Defendant's History

Abdul Kadir is a 59-year-old Guyanese man whose mother died before he reached age two. He grew up under his father's care and remained close to his dad, Victor Seaforth, until his recent death, Sept. 2010, due in part to the stress related to Abdul's incarceration and subsequent conviction.

While he was raised in what he describes as a middle-income environment, it was middle income in context only. Guyana is a third-world country, and a middle-income upbringing there would be considered a subsistence existence in the U.S. He was, however, loved, encouraged and taken care of.

Through government-sponsored scholarships he attended university and studied engineering in Trinidad at the University of the West Indies. [At no time while in Trinidad, did he meet Abu Bakr, a resident of Trinidad and a figure whose name arose in connection with the JFK conspiracy. Kadir only met Bakr once, as he testified at trial, when he was mayor of Linden and Bakr was making an official visit to that town.]

After obtaining a Bachelor of Science in civil engineering, Kadir returned to Guyana and began a 22-year-career in that field joining the Linden Mining Enterprise in 1981 as an engineer-in-training and advancing through the ranks until 2003 when he became a Senior Civil Engineer. (H. James, CEO, Linden Mining Enterprise, p.3)

1

Although brought up as a Christian, Kadir and his wife, Isha, converted to the Muslim faith in the early 1980's. He felt the Muslim faith answered certain questions that Christianity did not and he enjoyed the calm, orderly and serene atmosphere of the mosque he attended. In short, he found it spiritually inviting.

Around the same time one of his young children became seriously ill. He brought him to a mosque for the Iman to "pray over." Within a short time his son was healed. This further solidified his ties with Islam.

He became a devout Muslim, interested in propagating the SHIA Muslim faith in Guyana. Not only did he see Islam as a religion but as a pacific way to encourage others to work hard, educate themselves, build institutions and become self-sufficient.

Guyana is made up primarily of three religious groups. Hindus—generally the country's ethnic East-Indian population; Christians, the majority of the country's black, afro-origin population, and Muslims, only 10% of the country's black, afro-origin population.

Of the Muslim groups, the SHIA Muslims, whose mother-church is Iran, make up the minority. There are no formal Shia mosques in Guyana, certainly not in the vein of developed, well-constructed edifices to religion like those in the U.S., but rather make-shift structures, such as the small house in Linden where Kadir's son lived and presided over Shia services.

It was in this capacity that Kadir contacted Iran and hoped to secure support for the funding of a Shia mosque. [While he wrote many letters, he never received any money.] He did, however, purchase a small piece of property in Linden, and hoped to build a structure that would serve as a focal point for what he hoped would be a growing Shia community. To this end he created the Linden Islamic Trust and drew up brochures to solicit interest and funding to build a "Masjid" complex. (p. 18)

All of Kadir's nine children were brought up as Muslims and three of them were sent to university in Iran. Daughters, Baiynah and Sauda attended Jameat al-Zahra, a university near Tehran, while son, Salim, attended Qom Seminary at the Islamic Sciences World Center, Tehran.[1]

In conjunction with arranging for his children's studies there and keeping in touch with them, Kadir wrote to Moshen Rabbani, another name that came up in the course of the trial. It was the government's position that Rabbani and Kadir corresponded to make terrorist plans. This is not true and unsupported by the evidence. In reading the letters to Rabbani, (p. 20, attached herein) and both considering the contents as well as their dates, it's clear this letter writing occurred in the context of his children's education, to arrange Hajj-- visits-- to Mecca, or to introduce himself as Mayor of Linden with an interest in

---

[1] These universities are legitimate international places of learning which accept students from all over the world. (Transcript of classes, p. 19)

further development of what he called the "Caribbean Islamic Movement." All were written long before his involvement with the JFK conspiracy.

While Rabbani was indicted in connection with the bombing of a Jewish center in Argentina, the indictment occurred sometime after the bombing itself, and it should not be assumed that Kadir was aware of this event in Georgetown, Guyana. Rabbani, in fact, was posted back to Iran where he held a number of different positions in the government including a posting with the education ministry.[2]

Guyana's relations with Iran are very different than those of the U.S. As a third-world country, Guyana is in a much less powerful position than the U.S. in relation to the countries they can and cannot afford to befriend. Iran has long supported development in Guyana (letter by Linden Mayor, Orin Gordon, p.1), and the notion of visiting Iran to pursue Islamic studies is no more unusual for a devout Muslim than a Catholic choosing to visit Rome. Such travel carried no stigma in Guyana or presumption that the person traveling was affiliated with terrorism.

During his hard-working life, Kadir and his wife brought up nine children. (p.21) He was the sole support for his family. They lived together on a rural street in the back roads of Linden where they shared bedrooms, one bathroom and a shower which worked intermittently and often with only cold water. While he always maintained a job, starting as a clerk in the Ministry of Agriculture and Finance, progressing to the Water Authority in their water purification plant, then moving on to civil engineering, his salary was not high by American standards. (Generally around $200/week.)

They lived a simple, law abiding life, contributing what they could to the community and encouraging their own children to go to university, read and be curious about their world.

Kadir was a pack-rat. He saved everything—books of every nature, magazines, pamphlets, letters, notes and newspapers articles-- often for decades, on his computer and in shelves, boxes and drawers in their home.

He had an inquiring mind and the naivety of someone who becomes enthralled in a subject and doesn't see how his inquiring nature might be used against him.[3] In their letters his daughters explain how he loved to play with them, striking poses, dancing with his grandchildren, and joining their games. He was a strict dad, but loving and protective, rushing to his children's aid when the school called or to help with homework. His standards were high, but he was not without a sense of humor. (Children's letters)

---

[2] One of the problematic areas of presenting a defense in this case was securing corroboration of information from overseas. Although we sent investigators to the Iranian consul in New York, employees there were suspicious of our aims and reluctant to provide any information. Similarly in doing web searches and even calling the universities numerous times, we received no information.

[3] While he corresponded with representatives of the Iranian government in the 80's, he did not believe himself to be a spy. In the zeal of his newfound religion, he was happy to write letters detailing information that anyone could glean from the local papers, and never imagined it could be used for any other purpose than the further development of ties between Guyana and a more-developed country.

3

In his youth, he was aware of the "black power" movement in the United States and held out hope that, through education and economic development, Guyana's black population could advance. In his home are photos of both Martin Luther King and Malcolm X (a figure not seen as controversial in Guyana.)

He owned a gun, legally licensed, and kept it both because of his position of prominence in the community which brought with it certain risks, but also because corruption and violence is not uncommon in Guyana. [The guns depicted in the photos introduced at trial were toy guns. The family often mimicked movies they saw on television and everyone in Linden has access to what look like actual weapons at local market places where toy guns are routinely sold around Christmas. Counsel visited those stores and confirmed that guns similar to those in the photos were sold. The government's claim that these guns were real and that Kadir and his daughter lied on the stand when they stated otherwise is based on shear conjecture.][The daughter, Sauda, who was present when the photos were taken and is depicted in several of them, could not testify on her dad's behalf because she has been put on a U.S. 'no-fly' list.]

In addition to working as a civil engineer in the bauxite quarry near his home, Kadir routinely contributed, through his time and knowledge, to local community projects. This ultimately led to his election as Mayor of Linden from 1994 to1996, then to the Guyanese Parliament on behalf of the PNCR party (People's National Congress Reform) from 2001 through 2006.

As stated in the letter from PNCR General Secretary, Oscar Clarke, (p.2), "Abdul Kadir served with exceptional dedication." He was a member of several Committees including Chairman of the Parliamentary Sectoral Committee on Natural Resources. The Party went out of its way after Kadir's arrest to issue a press statement declaring, "He [Kadir] has been a well respected member of the Linden community, and, to the best of our knowledge, *has never in our Party or in Guyana, displayed a proclivity for illegality or any form of extremism*." (p.4)[emphasis added]

The question becomes how does a man, so well educated, principled, non-violent, community minded, without training or interest in violent extremism become involved in a plot to blow up JFK airport? How can the life of an upstanding public citizen, father of nine, grand father of 23, hard-working, self-sacrificing and curious reconcile with the nihilistic goals of a terrorist?

## Kadir's Involvment in the Plot

Abdul Kadir had only been to the United States once, and that on a brief passage through the Miami airport. His daughter Baiynah Kadir lives in Texas and is married to a U.S. citizen. Another daughter, Sauda, is engaged to be married to a U.S. citizen.

Kadir never harbored ill will against the United States and in fact, respected the progress African Americans made here under the tutelage of Martin Luther King and Malcolm X. (He hoped, in fact, to achieve similar gains in self-respect and independence

4

among black citizens in his own country, who often see themselves as victims of discrimination by Guyana's East Indian population.)

Kadir had no idea of any plot nor was he involved in the machinations of Defreitas, Francis, Rutherford or others in Georgetown when the plot began in 2006. For over six months, plotters, spurred on by paid-government informant Steven Francis, laid the groundwork for a plan to blow up fuel tanks at JFK airport. They met at Rutherford's office. They agreed to video the tanks on site. They gave the plan a code name, "the Shining," and talked about reaching out to regional terrorists such as Adnan Shukrijumah and Abu Bakr in Trinidad for backing. Francis and Rutherford even talked of other terrorist plans such as bombing the American and English consulates in Guyana.

Defreitas and Francis took hand-held videos at JFK airport, but the plan fell apart when the two returned to Georgetown and an argument ensued over the non-Muslim conduct of Francis. Members of the group began to suspect each other and Rutherford and cronies backed out.

Steven Francis had been so close to actualizing his goal—benefitting from a cooperation agreement which mandated that his assistance lead to the arrest and prosecution of terrorists-- but now it had fallen apart. He could not make any strides which would lead to the prosecution of individuals unless he pushed the plan further, found other people to pick up the slack created by Rutherford's absence, knowing that with just Defreitas as his aid, the plan had no chance of success.

To effect this end, he and Defreitas reached out to all contacts available who might either join the plot or suggest others who would. This was how they were put in touch with Abdul Kadir.

They'd crossed paths with Kadir casually in Georgetown some days earlier, but did not know him prior. They were driven to his house by a relative of Kadir's wife at which time Francis showed the amateur video taken at JFK airport.

Kadir did not kick them out of his house, or report them to police. He was confused as to why these men would have approached him and did not take them seriously. Two men coming from the U.S., one retired, the other a barber, looking for support in a third world country to fund a terrorist plot—to Kadir the idea was fantastical. Further proof of the unlikelihood that these men posed a danger came when they showed him the shaky video, taken through a car window, of the airport. His reaction was understandable-- Haven't you guys ever heard of Google Earth?

In the ensuing conversation, while he never said he was interested in participating in the plan, he said he would see if others he knew might be interested. [None of this crucial first conversation was recorded by Francis, thus there is no objective way to know which party, Kadir or Francis, is describing the contents of the conversation more accurately.]

5

Kadir never had any intention, nor did he, call anyone to further the plot. He was interested, however, in stringing the pair along. During that first conversation he spoke of his interest in building a mosque in Linden. He showed them plans and gave them brochures. As luck would have it, Defreitas worshipped at a mosque in Queens where a former school friend of Kadir's, Bilal, prayed. Kadir saw Defreitas as a link to Bilal and a way to reach other people interested in supporting the development of the Shia faith in the Caribbean. He sent them off with his materials and a promise to check in with his contacts about the plot.

The two took Kadir's promotional material back to the U.S. and in ensuing phone conversations with him the matter of the mosque promotion was at the heart of Kadir's interest. This is demonstrated by the amount of time the defendants spent discussing the mosque project and not the JFK plot and how Kadir always steered the conversation back to this topic.

Repeatedly, on calling Kadir, Francis had to remind him about the people he promised to contact, as if Kadir had forgotten this was his role, but Kadir kept putting them off. At one point, Francis acknowledges that he doesn't really think Kadir is interested in the plot at all.

> Anas (Francis): *Yeah, I didn't feel comfortable with him. [referring to Kadir] I don't even bother to arrange whatever, whatever was left here. I don't think they have access to it. In any case, I don't think he, he's that interested in looking or.*
> Defreitas: No.
> Anas: *He doesn't care. But everything (UI) computer, is in the computer.*
> p. 9, lines 31-41. (Transcript of conversation from 2/20/07, ID-56, p. 9, lines 31-41.)

Ultimately Kadir tells the pair in no uncertain terms that his friends "don't want to deal with that hatchery." (March 7th, 2007, Track 1282, p.2; March 7, 2007, ID 61, p. 7-8.)

> *"They said that, you know, they don't want to deal with that kind of stuff now."* (p.7, lines 9-13).

In reality Kadir never called anyone, nor did the government present any proof to the contrary.

Francis and Defreitas had several more phone conversations with Kadir, always initiated by either Francis or Defreitas. Kadir never called either man.

On their return trip to Guyana, Francis stays at Kadir's son home, the acting mosque. It was at this time, Francis displays the map downloaded from Google Earth to Kadir and asks him questions about blowing up the tanks.

Kadir, having no specific knowledge or experience with fuel tanks or dynamite, answers 'the best he could,' in the sense that he tells them whatever first came to his mind— double tanks [must mean] double explosion. Whether his answer made sense or

not, the point was to keep the pair *believing* he was assisting them, so they might continue to help find U.S. money for the mosque. He still believed that Francis and Defreitas were not serious threats to anyone, but rather pretenders who lacked both the know-how and intent to pull off anything.

## Kadir's Philosophy Differed from that of the Plotters

During that same week at Kadir's son's house, Francis, Kadir and another man staying there, Hussain, had philosophical discussions about the legitimacy of the extremist tactics used by al Qaeda. They spoke of Hezbollah's social programs and the hospitals and schools they built. Kadir specifically tells Francis, "We have no justification to destroy anything, because we have built nothing."

He propounds his belief that Hezbollah has the right "to defend the institutions they have created."

> Kadir: *"And if you look at specifically at the schools, the hospitals, the roads, the families that they have built and assisted, the whole social structure of Islam. So if it is being attacked physically, then they will be defending something that they have built. On the other hand, the reality is that we haven't built anything."*

> Anas: Yeah.

> Kadir: *"So we do not have anything to defend."*
(5.19.07, ID-79, Session 13, p.19. lines 24-43. In evidence, Gov't )
--------

In another part of that same conversation while Kadir stands by listening to his student speak, Hussain explains to Francis that they are not in agreement with the tactics of Al-Qaeda.

> Hussain: *"There are a lot of groups killing the innocent people. Brother, we discuss this but, I don't know he is maybe different…with respect to Bin Laden and all who are in just line of Al-Qaeda, but tonight because you are leaving, brothers I want to make sure that our opinion is, we are not with Al-Qaeda and we do not support Al-Qaeda, not because they are fighting, ah, because their policy is wrong."* (5.19.07, ID-70, Session 13, p.49, lines 1-7, not admitted into evidence over defense objection.)

In this conversation Hussain uses the pronoun "we", referring to his teacher, Kadir, who is standing next to him.

It's at this same time that Kadir tells Francis that he will not accompany them to Trinidad, presumptively to meet Abu Bakr.

7

While in Trinidad, unbeknownst and unexpected by Kadir, the group calls him, asking to deposit monies from the "chicken coop" into his mosque account. They reach him unaware. Believing them to be speaking of the refunded money from whomever bought his ticket to travel to Trinidad, and acknowledging that he would only go along if the sponsor agreed that the money would now be going toward the development of his mosque, he permits it.

Within a few days he is arrested on his way to Iran via Trinidad and Venezuela. Defense counsel has spoken to Sayeed Tasdiq, the highest ranking Shia Iman in Guyana, an Indian man who has been living in Guyana for several years. Tasdiq confirmed he asked Kadir to go to Iran to represent the Caribbean in the commemorative services honoring the death of Ayatollah Khomeini. While the plan had been made in advance, Kadir mistook the date of the services believing it to be based on the Muslim and not Western calendar and only bought his ticket a day before his departure, having borrowed the money and been reminded by Tasdiq to depart.

The government posited at trial that Kadir was on his way to Iran in furtherance of the conspiracy, however this is contradicted by the facts. The alleged co-conspirators had no clue Kadir was in Trinidad enroute to Iran. One of the co-conspirators, Kareem Ibrahim, even told Francis he was contacting his own man to bring the plans to Iran, not Kadir.

Furthermore Kadir had nothing in his possession to display, explain or promote the plot to anyone. The value of the plot lay in the knowledge in Defreitas' head, gained through years of working at JFK, travelling the roads and being familiar with the access and egress routes. As explained at trial, anyone could download the Google Earth map of JFK. Without the personalized knowledge Defreitas had, Kadir had virtually nothing to sell. (It's pure speculation that because Kadir carried a flash drive which included photos of him carrying weapons, that he was demonstrating his "bone fides" to Iranians. The drive contained thousands and thousands of documents, among them the aforementioned photos of his family with toy guns.) For a man who kept everything he ever read, wrote or noted, what's more telling is the fact that he had nothing relating to the JFK plot on his person or in his computer—no notes, no drawings, no blue prints, no photos.

## Kadir's role was Minimal

Kadir had nothing to do with the inception of the plot, its development or its propagation. While he did advise the group on how to approach Abu Bakr, he never contacted him, nor did he have the means to get his attention, having only met him once in the 90's in his official capacity as mayor of Linden. Defreitas himself acknowledges in conversations with Karim Ibrahim in Trinidad that Kadir *can do nothing. Guyana's behind the times. Um, he has no connections, to say, Trinidad.*" (Gov't Ex. 224T, p.44, 1-6).[4]

---

[4] While the government tried to rationalize this conversation as Defreitas' attempt to buffer Kadir from harm should Ibrahim not be interested in the plot, the straight-forward and more logical way to interpret this is that Defreitas meant what he said, *Kadir can do nothing.* There is no evidence to support the government's reading of Defreitas's supposed occult meaning.

Kadir affirmatively told the group he would not go with them to Trinidad, that his 'friends' were not interested in the plot, that he did not condone using violence to defend anything, since they'd created nothing to defend. He was on his way to Iran as an invitee of Iman Syeed Tasdiq, without the knowledge of his putative co-conspirators and without any information to sell to the Iranian government.

He never sought out Francis or Defreitas to push the plot along, or encouraged the participation of others. [In setting up the pair to stay with "associates" in Trinidad, he referred them to former students and friends who could either put them up in their apartments or help them find lodging. Showing hospitality to an 'outsider,' especially a Muslim 'brother,' is common practice in Caribbean culture and should not be imbued with any nefarious criminal intent in an of itself.]

While he did tell them he believed the explosive used should be 'double', he based this on no study, knowledge or personal experience, but a random guess to keep Francis and Defreitas interested in him long enough to promote his mosque in the U.S. (Something held out in conversations to Kadir like a carrot on a stick, but which produced no results.)

There's no doubt he should not have done even this, but his words and actions are more akin to providing material assistance to terrorism, than the crime for which he was found guilty.

## Providing Material Assistance

Among his co-defendants, the government permitted Abdul Nur to plead guilty to providing material assistance to promote terrorism, (18 USC 2339), a crime which carries a maximum sentence of 15 years.

Yet Nur arguably played a greater role than Kadir in advancing the JFK plot. He secured a false traveling document to visit Trinidad, he bragged of connections with Adnan Shukrijuma, he went to Trinidad to set up a meeting with Abu Bakr, contacted him and stayed at his compound. Because of his plea, Nur cannot get more than 15 years.

It's interesting to note that before trial, prosecutors at the EDNY represented that Abdul Kadir could also plead to the charge of providing material assistance to terrorists. Kadir agreed to do this. However when permission for this plea was sought in Washington D.C., the plea offer was withdrawn. (Even the government, at least representatives from EDNY, presumably believed before trial, that a sentence of no more than 15 years was appropriate for Mr. Kadir.)

In comparing levels of culpability, Russell Defreitas was involved in the plot far longer and more seriously than Kadir. Yet probation is recommending the same sentence for both men. Considering how Defreitas conceived the plan, found men in Guyana willing to undertake it, spouted anti-Semitic and anti-U.S. venom, went to JFK to locate the fuel tanks and invested so much time and energy in the plan, it would be inequitable for

9

Kadir, with his relative minimal involvement, to be sentenced to the same amount of jail. (Because of their ages, a sentence of 40 years would guarantee that both men die in prison. Even if sentenced to 30 years, it's likely Kadir, who would then be near 90, would survive his time there.)

In sentencing Kadir, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6).  In that context a sentence of 40 years, tantamount to life, would be unduly harsh compared to sentencing of other convicted terrorists whose acts have led to far more serious crimes, damages, and death than that perpetrated by Kadir.

## Comparative Sentencing in Other Terrorist Cases

Not all terrorism crimes are the same.  The Pakistani immigrant, Faisal Shahzad, who tried to detonate a car bomb on a busy Saturday night in Times Square was sentenced to life. He was clearly someone of a terrorist bent, who used the court as a bully pulpit to further his terrorist aims. "Brace yourselves, because the war with Muslims has just begun," he told the judge. "Consider me the first droplet of the blood that will follow."(Associated Press, Oct.5[th], 2010)  Kadir made no such outbursts in court, had no such history, and no such aims.

Shahzad's punishment for building a propane-and-gasoline bomb then driving it into the heart of the city in an SUV last May was as close to succeeding as plans could come. He will justifiably spend the rest of his life in prison, but so will Kadir, if sentenced to what probation recommends.

Other examples of hard-core terrorists who received sentences less than what probation recommends here include:

- "Black September" terrorist Khalid Al-Jawary, convicted in 1993 of placing three
- car bombs in New York City in 1973 (two on Fifth Ave. and one at **JFK Airport**) was deported to Sudan in February, 2009, having spent only 10 years in jail.  The bombs failed to detonate.  See *Black September Terrorist Gets Deported to Sudan,* Wall Street Journal, March 4, 2009.

- Fu Kikumura, a member of the Japanese Red Army arrested in 1988 on the New Jersey Turnpike carrying plans for bombings in New York was released in April, 2009, after serving a 21-year-sentence, reduced from 30 years by the Third Circuit. *See U.S. v. Kikumura,* 918 F>2d 1084 (3rd Cir. 1990).

- The defendants known as the "Lacawana Six" were arrested in 2002 for traveling to Afghanistan and training at an *Al Qaeda* camp where they were trained in war tactics, explosives, and weapons. All six were convicted of providing material support to *Al Qaeda* and received sentences from seven to ten years.

10

- Kevin James conspired to levy war against the U.S. government through terrorism and to oppose the force of authority of the government.  While in a California prison he formed a domestic terrorist group that planned to attack military and Jewish facilities in the L.A. area.  After pleading guilty he was sentenced to 16 years in prison.  His co-defendants, Levar Washington and Gregory Patterson, who recruited others to the plot and took other steps to further the conspiracy, were sentenced to 22 years and 151 months, respectively.[5]

- Monzer Al Kassar and Moreno Godoy were found guilty after trial of 1)conspiracy to murder U.S. nationals, 2) conspiracy to murder U.S. officers, 3) conspiracy to acquire and export anti-aircraft missiles, 4) conspiracy to provide material support and resources to a designated foreign terrorist organization, and 5) money laundering.  Mr. Kassar was sentenced to 30 years in prison.  His co-defendant, Mr. Godoy, was sentenced to 25 years in prison.[6]

- John Walker Lindh, charged with conspiring to murder U.S. nationals and provide material support to terrorists for attending an al-Qaeda training camp, participating in a violent prison uprising that resulted in the death of a CIA agent, pleaded guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony.  He received a 20-year sentence.[7]

- Christopher Paul pleaded guilty to conspiracy with others to use weapons of mass destruction against a U.S. national outside the U.S. and against tourist destinations in Europe and the U.S.  He was sentenced to 20 years.[8]

- Shahawar Matin Siraj was convicted of conspiring to plant explosives at the Herald Square subway station in Manhattan.  He received a sentence of 30 years.[9]

- Wesam al-Delaema pleaded guilty to conspiracy to murder Americans overseas in part by planting roadside bombs against U.S. soldiers in Iraq and demonstrating in videos how to detonate the explosives.  He received 25 years imprisonment.[10]

- Several defendants in the plot called "Operation White Terror" were convicted of planning to exchange drugs for shoulder-fired, anti-aircraft missiles, assault rifles, nearly 300,000 grenades and 300 pistols.  The plot continued until after the

---

[5] See, *Man Who Formed Terrorist Group that Plotted Attacks on Military and Jewish Facilities Sentenced to 16 Years,* U.S.D.O.J. Press Release, at nefafoundation.org/miscellaneous/FeaturedDocs/US_v_James_dojprsent.pdf
[6] Nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Kassar_dojprsent.pdf
[7] See, *Sentencing Memo of U.S. District Judge Ellis, at* nefafoundation.org/miscellaneous/FeaturedDocs/u.s._v_lindh_sentencingmemo.pdf
[8] Nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Paul_dojprsent.pdf
[9] Nefafoundation.org/miscellaneous/FeaturedDOcs/US_v_Siraj_DOJPRSentencing.pdf
[10] Nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Delaema_fbiprsent.pdf

11

weapons were delivered, yet only one defendant received a sentence longer than 360 months. The others received sentences ranging from 168 to 300 months.[11]

Perhaps most illustratively, even persons convicted in the Guantanamo Bay military commissions—described by Secretary of Defense Donald Rumsfeld as "the worst of the worst," received sentences much lower than what probation is recommending for Mr. Kadir. Salim Hamdan, Osama bin Laden's driver in Afghanistan, was sentenced to time served (the five years he had already served). David Hicks, who pleaded guilty to material support to *al Qaeda* in Afghanistan following the September 11, 2001, attacks, received a seven-year sentence.

According to statistics compiled by The Center on Law and Security at New York Law School, the average sentence for persons convicted of terrorism crimes is 181.2 months or 15.1 years. Of the so-called "Top 50 Plots," defined as the highest-profile non-financial cases, the average sentence for persons convicted of terrorism is 206.4 months, or 17.2 years. (See *Terrorist Trial Report Card: Sept. 11, 2001- Sept.11, 2010,* available at Terrorism_Trial_Report_Card-Sept_2010-NYU.pdf.)

These averages are far below what probation is suggesting as an appropriate sentence in this case.

## Kadir's Punitive Pre-Trial Incarceration Should be Considered in Reducing his Sentence

Abdul Kadir has been incarcerated since June, 2007. First he was placed in segregated confinement in a top security prison in Trinidad, then extradited, wearing a bag over his head, by airplane to the U.S.

While in Trinidad he was subjected to crowded cells, unsanitary conditions, inadequate food and cold water for bathing. According to the U.S. State Department Reports on Human Rights: 2008, Trinidad and Tobago, conditions in the jails in 2007 were harsh. The capacity of the prison was twice as high in 2007 than what it was built to contain. "According to the prison service commissioner, the Port of Spain prison, originally designed to accommodate 250 inmates, held 528 prisoners, compared with 599 in 2007. At peak levels, the maximum number of prisoners in a 10- by 10-foot cell increased from eight to 10."[12]

This harsh pre-trial treatment of Kadir continued once he arrived in the U.S. From the get-go he was placed in segregated housing, or solitary confinement, from the summer of 2008 to the present. All of his privileges have been severely restricted. He has limited access to television, newspapers, recreational facilities, visitors, and most significantly, human contact. He spends 23 of 24 hours in a cell by himself, then is removed for one

---

[11] *Terrorist Trial Report Card: U.S. Edition,* Appendix B at 10, NYU School of Law, Center on Law and Security.
[12] http://www.state.gov/g/drl/rls/hrrpt/2008/wha/119175.htm

12

hour a day to another cell, and allowed to pace in it as his sole form of recreation. His every action is monitored, and his outside contact with family limited, even by telephone.

These conditions have seriously compromised his 6th Amendment rights to counsel. His attorneys have had to wait for hours just to be admitted to the floor on which he could be seen. At each visit there were further delays, once inside, because he had to be escorted, wearing feet and wrist shackles, by the one Lieutenant on duty, along with another three guards to the small visiting room. Getting out of the visiting room was equaling time consuming.

All of this, took its toll both emotionally and physically on Kadir.

Many courts have considered the severity of pre-trial detention in sentencing defendants to lesser prison terms than what they would have otherwise received. According to Judge Sweet in *U.S. v. Behr,* F. Supp.2d, 2006, WL 1586563, "many courts have noted that the severe conditions of pretrial incarceration amount to an administrative form of punishment. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 537-38 (1979); *see also United States v. Gallo,* 653 F.Supp. 320, 336 (E.D.N.Y.1986)(noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe.") In sentencing the defendant to time-served, Judge Sweet noted, "Recently, the Honorable Kimba Wood reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at the MCC, the same building in which Behr [the defendant in front of Sweet] has been housed for nearly 29 months."

Kadir's isolation in the segregated housing unit has presented even harsher conditions than J. Sweet found in *Behr, supra.* As Justice Sotomayer wrote in *Lee v. Couglin,* 26 F.Supp.2d 615 (SDNY, 1998), sentences in punitive segregation in virtual isolation conditions, even while exercising, with limited visits and virtually no personal belongings, present a dramatic departure from ordinary prison life."

Kadir has withstood the deprivations of solitary confinement for the past three years. These conditions, in and of themselves, have been unusually punitive and due to no infraction he committed or danger he posed to his community. Although he submitted multiple "cop-outs" (requests for information) to BOP administrators, he has remained in solitary confinement merely because of the nature of his charge, not the nature of his behavior.

Counsel is concerned that this apparent knee-jerk reaction of the Bureau of Prisons to place defendants accused or convicted in segregated housing units may prompt them to place him in what's known as the 'supermax' prison (ADX Florence) in Florence, Colorado. This prison is even more punitive than anything Kadir's faced thus far. Based on reports from people who've visited and press reports, cells are underground permitting no daylight, prisoners see no other human beings, don't even know who the man in the cell next to them is, and have cannot even tough the letters sent to them by friends and family. (These are merely displayed to them by video.)

13

While counsel is aware the Court has no controlling power over BOP designations, we ask the court to consider recommending that Kadir, because of his age, non-violent history, and spotless record while in custody both here and in Trinidad, to recommend that Kadir not be placed in ADX, Florence.

## Conclusion

Abdul Kadir is described by people who've known him (see letters) as a decent, hard-working, pacific, principled man, a "perfect" father, a community leader, who never committed a crime, contributed to his community and sought to better his country.

Attached to his pre-sentence submission are dozens of letters from family and friends, as well as a petition signed by close to 300 supporters from the Linden, Guyana, community who to a person attest that Kadir is a "respected, loved member of our community." "He has always imparted peaceful and thoughtful words. He is the kind of person that would go beyond the call of duty to assist and help others." (petition, attached.)

The thought that he would engage in terrorist crimes is unthinkable both to his political party (see letters) and everyone who knew him. He did not initiate the scheme in this case nor participate to the extent of his co-defendants.

The crime itself, here, a conspiracy and not a choate act, caused no damage to anyone. The conspirators did not achieve their putative end. No one was hurt; no injury suffered.

It has been acknowledged by government sources that the group lacked the wherewithal to commit the crime in the first place, and even if they had the funding, intelligence and logistical support to move forward with their plans, the plot (to cause a tunnel of fire reaching through gas pipes all the way to New Jersey,) was, as noted by experts, a technical impossibility.

The basis of this conspiracy was a 'sting' operation. The plot was pushed forward at every turn by a government cooperator, Steven Francis, who stood to gain the most from his success at promoting the plot and making sure it didn't die through neglect. Without the involvement of the cooperator it's unlikely Kadir would have ever met Defreitas, or would ever have become involved in any terrorist plan, at all.

He was, however, found guilty and sentence must be imposed.

Not all terrorist plots are created equal. It's difficult to zeal from fairness in the government's efforts to protect society from further attacks by either would-be terrorists, real terrorists, or people lured into terrorism.

Pursuant to 18 U.S.C. § 3553(a) a sentence must be imposed that is "sufficient, but not greater than necessary" as is required in accordance with the Supreme Court's decision

14

in *United States v. Booker,* 125 S.Ct. 738 (2005) and the Second Circuit's decision in *United States v. Crosby,* 397 F.3d 103 (2nd Cir.2005). In particular, section 3553(a)(1) asks that the sentence imposed consider both "the nature and circumstances of the offense and the history and characteristics of the defendant," while section 3553(a)(2)(A) demands that the penalty "provide just punishment for the offense" that simultaneously "afford[s] adequate deterrence to criminal conduct" as required by § 3553(a)(2)(B). Furthermore, pursuant to § 3553(a)(6), the Court is also mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

In reviewing the facts of this case, counsel urges the court to impose a sentence below the guidelines range.

Kadir has no criminal history, played a minimal role in the conspiracy, and was originally offered a plea (later withdrawn) to providing material assistance to terrorism with a 15-year cap. His sentence should not be equal to that of his co-defendant, the putative 'ring-leader' of the conspiracy, Russell Defreitas. Kadir deeply regrets having ever engaged in conversations and meetings with the group, and deeply regrets the harm he has caused to the U.S., his family and his nation, Guyana.

At its base, Kadir is a decent, intellectually curious man, who wanted to build a mosque and got involved deeper than he should have by entertaining ideas from men he never believed could pull off what they intended. But by not taking them seriously, not condemning them outright, and not reporting them to police, he involved himself in discussions and advisals that were found to be illegal.

Most of Kadir's family lack the funds or are unable to visit the United States. (Some are on U.S. 'no-fly' lists.) It's unlikely he will ever see them again. Counsel asks the court to consider giving him a sentence merited in this case, but one that will permit him, at some point, even if only at the end of his life, to return to his family and his country.

Regards,

Toni Messina, Esq. and Kafhani Nkruma
100 Lafayette Street, Suite 502
New York, NY 10013

CC: Marshall Miller, AUSA (ECF)
    Probation, Frank Marcigliano, Jr. (ECF)
    Counsel for Defreitas, Mildred Whalen (ECF)

15