UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,     :
                                           :          **REDACTED MEMORANDUM**
              -against-               :                 **& ORDER**
                                           :          07-CR-543 (DLI)(SMG)
RUSSELL DEFREITAS,                  :
      also known as "Mohammed,"    :
KAREEM IBRAHIM,                     :
      also known as "Amir Kareem"    :
      and "Winston Kingston,"       :
ABDUL KADIR,                           :
      also known as "Aubrey Michael Seaforth," :
AND ABDEL NUR,                       :
      also known as "Compton Eversley,"    :
                                            :
                           Defendants.       :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Familiarity with the factual background, charges, and procedural history of this case is assumed. *See generally United States v. Defreitas et. al.*, 2010 WL 1850950 (E.D.N.Y. May 6, 2010); *United States v. Defreitas et. al.*, 2010 WL 1223244 (E.D.N.Y. Mar. 24, 2010). Via pretrial memorandum, the government requests empanelment of an anonymous jury and partial sequestration of the jury during trial.[1] Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and Rules 701 *et seq.* of the Federal Rules of Evidence, the government also discloses its intent to call two expert witnesses at trial. (*See* Docket Entry No. 195.)

Defendants jointly oppose the anonymous jury request, and move for an evidentiary hearing on the matter. (*See* Docket Entry No. 171.) Defendants also jointly object to both of the

---

[1] At the request of the government, and due to the sensitive nature of the information provided, the court ordered the unredacted version of this request to be filed under seal as Docket Entry No. 160. The redacted version was filed on the pubic docket as Docket Entry No. 176. The Court orally granted this motion at the pre-trial conference held on June 2, 2010, and advised the parties that it would post a redacted and sealed unredacted Memorandum and Order detailing its reasoning.

1

government's proposed experts.[2] (*See* Docket Entry Nos. 201, 220–22.) Additionally, Defendant Ibrahim alone moves to compel disclosure of certain intelligence material, pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* Docket Entry Nos. 170, 190, 195, 201.)

Defendants do not oppose the government's requests regarding partial sequestration—specifically, that the jurors be "kept together during recesses and . . . provided lunch as a group each day during trial," and "escorted to and from the courthouse each day during trial . . . by the United States Marshals Service." (Gov't Mot. 2.) Accordingly, the court exercises its broad discretion to grant these unopposed requests in their entirety. *See United States v. Eisen*, 974 F.2d 246, 267 (2d Cir. 1992). Furthermore, for the reasons set forth below, the government's anonymous jury request is granted in its entirety, without the need for an evidentiary hearing. Defendants' objections to the government's proposed expert witnesses are overruled. Finally, Ibrahim's motion to compel disclosure is denied.

## DISCUSSION

### I. Government's Request for Certain Protective Measures

The government contends that an anonymous jury is necessary for three reasons. First, the government cites to the gravity of the crimes charged in the indictment, arguing that their "serious and violent nature" "would cause a juror reasonably to fear for his or her own safety." (Gov't Mot. 18.) Second, the government notes that both foreign and domestic media coverage of the trial has been extensive, and is likely to "intensify significantly" as the trial draws near.

---

[2] In the alternative to precluding the testimony of the expert witnesses, defendants request that they be allowed to cross-examine the witnesses regarding Jamaat al-Muslimeen's ("JAM's") current capabilities, and regarding certain benign operations conducted by Hezbollah. (*See* Docket Entry No. 222, at 2.) Defendants also move to introduce additional relevant segments of recorded conversations pursuant to Federal Rule of Evidence 106. (*Id.*) The court denied these motions from the bench.

2

(*Id.* at 10.) Third, the government cites to several potential threats to the judicial process itself, some of which stem from defendants' alleged association with the Trinidadian militant group Jamaat al-Muslimeen ("JAM"), and its leader, Yasin Abu Bakr. (*Id.* at 13.) ███████
███████

███████
███████
███████

███████
███████
███████

Defendants rebut the government's first argument by contending that "a talismanic recitation of terrorism-related words" is insufficient to justify an anonymous jury. (Defreitas Mem. 4.) Regarding the second argument, while they acknowledge that there will likely be a significant amount of media coverage, defendants contend that there is no indication that such coverage "will pose a risk to juror safety." (*Id.* at 10.) With respect to the government's third argument, defendants describe any connection between themselves and JAM as "tenuous," and dispute the government's allegations as to JAM's or their own ability to disrupt the judicial process. (*Id.* at 7–9.) ███████
███████

### A.  Legal Standards

As a general matter, a district court "has broad discretion to take such steps as may be necessary and appropriate to permit the jury to concentrate on the trial proceedings and to evaluate the evidence in an atmosphere free from apparent threat or danger, so long as those

steps do not violate the defendant's fundamental rights." *United States v. Maldonado-Rivera*, 922 F.2d 934, 971 (2d Cir. 1990). Specifically, anonymous juries may be appropriate when "genuinely called for and properly used." *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991). While a district court has broad discretion to impanel anonymous juries, *see United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995), "the Second Circuit has . . . recognized that [they] may undermine the presumption of innocence and interfere with the defendant's ability to conduct an effective *voir dire*." GORDON MEHLER, JAMES GLEESON & DAVID C. JAMES, FEDERAL CRIMINAL PRACTICE: A SECOND CIRCUIT HANDBOOK 501 (10th ed. 2010) (citing *United States v. Wong*, 40 F.3d 1347, 1376 (2d Cir. 1994)). For this reason, the use of anonymous juries must "receive close judicial scrutiny and be evaluated in the light of reason, principle, and common sense." *United States v. Thomas*, 757 F.2d 1359, 1363 (2d Cir. 1985)). Such scrutiny requires a court to balance the defendants' interests in maintaining the presumption of innocence and discovering potential juror biases against the public's interest in a fair and reliable judicial process. *See United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994).

Factors that courts have considered in determining whether to impanel an anonymous jury include: (1) a defendant's demonstrated "willingness to tamper with the judicial process," such as threats made to witnesses or informants; (2) the dangerousness of a defendant as demonstrated by the seriousness of the crimes charged; and (3) the anticipated media coverage. *United States v. Quinones*, 511 F.3d 289, 296 (2d Cir. 2007); *see United States v. Wilson*, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006); *see also United States v. Khan*, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (compiling case law). If a court, based on an evaluation of these factors, determines that an anonymous jury is warranted, it must protect the defendant's fundamental rights by conducting *voir dire* in a manner "designed to uncover bias as to issues in the cases and

as to the defendant," and provide the jurors with a "plausible and nonprejudicial reason for not disclosing their identities." *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994); *see also United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991).

B.  **Analysis**

With respect to the first anonymous jury factor, "[e]vidence of threats made to witnesses, informants or jurors in current or prior cases demonstrates a willingness on the part of the defendant to tamper with the judicial process." *Khan*, 591 F. Supp. 2d at 169; *see also Paccione*, 949 F.2d at 1192–93 (affirming decision to impanel anonymous jury where threats were made against government witnesses). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

With respect to the second factor, it would be difficult to overstate the gravity of the allegations at bar. Defendants are charged with several conspiracies relating to a planned attack on John F. Kennedy International Airport. If successful, this attack could have paralyzed a major

5

U.S. and international transportation hub, destroyed a fuel pipeline stretching from Pennsylvania through New Jersey and the Eastern District of New York, and killed or injured thousands. While defendants are correct that the mere invocation of the word "terrorism" is insufficient on its own to justify an anonymous jury, the seriousness of the charges is among the factors a court may consider in balancing the competing interests at stake. *See Khan*, 591 F. Supp. 2d at 170; *see also Quinones*, 511 F.3d at 296.

The third and final factor also weighs in favor of impaneling an anonymous jury. "Consistent media coverage, even if minimal, provides support for anonymity as coverage enhances 'the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public.'" *Khan*, 591 F. Supp. 2d at 171 (quoting *Vario*, 943 F.2d at 240); *see also Paccione*, 949 F.2d at 1192–93 (discussing risk of media's "inappropriate contact" with jurors). It is expected that there will be daily, extensive media coverage of this trial. In addition to the numerous news reports that have already been published, the court is well aware that even the pre-trial status conferences, suppression hearings and oral arguments in this case have attracted numerous observers. The large Trinidadian- and Guyanese-descended populations in the Eastern District of New York can only serve to increase the level of local media attention, given that some of the defendants are Guyanese nationals and were arrested in Trinidad. Furthermore, the current public debate on whether to try those accused of involvement in the September 11, 2001 attacks in federal court—specifically, in the districts encompassing this city—ensures an even greater amount of media attention for this trial, further tilting the balance of interests in favor of the government's motion.

In sum, the balance of factors in this case weighs strongly in favor of an anonymous jury, and the court therefore exercises its broad discretion to impanel one. *See Aulicino*, 44 F.3d at 1116. In light of the government's submissions on this matter, there is no need for an evidentiary hearing. *See Khan*, 591 F. Supp. 2d at 172; *see also Aulicino*, 44 F.3d at 1116 (affirming similar decision without hearing).

With respect to the protection of defendants' fundamental rights, the parties jointly drafted a questionnaire consisting of one hundred questions for each potential juror to complete.[3] (*See* Docket Entry No. 198.) They were given an opportunity to review the completed questionnaires, and the court then held a hearing at which it entertained their respective motions to strike potential jurors for cause, based solely on the questionnaire responses. Following this hearing, the parties submitted follow-up questions for the remaining jurors, and were present for the entirety of the court's subsequent two-week questioning of these jurors. After the court selected a suitable pool of jurors and alternates, the parties were given the opportunity to exercise their peremptory challenges in accordance with the Federal Rules of Criminal Procedure. Such a comprehensive, lengthy *voir dire* unquestionably gave defendants a meaningful opportunity to discover any potential juror bias, and substantially diminished the chance of any infringement on their fundamental rights resulting from the empanelment of an anonymous jury. *See Thai*, 29 F.3d at 801. Significantly, as noted by the government, defendants have not indicated how knowing a juror's name, address, or employer's address would have meaningfully aided them in detecting any juror bias. (*See* Gov't Reply 6.)

As a final matter, in order to further protect defendants' rights, the court will explain the purpose of anonymity to the jury in terms carefully designed to both provide a "neutral and non-

---

[3] The parties stipulated to the vast majority of these questions.

prejudicial reason" for non-disclosure of their identities, and not introduce any bias against the defendants. *Maldonado-Rivera*, 922 F.2d at 971; *see also Paccione* 949 F.2d at 1192.

## II. Government's Proposed Expert Witnesses

By letter dated April 19, 2010, the government timely disclosed its intention to call two expert witnesses to testify at trial. (*See* Docket Entry No. 195.) The government supplemented this disclosure by letters dated May 6 and 7, 2010. (*See* Docket Entry Nos. 211, 214.) The government's first proposed expert, Matthew A. Levitt, is currently a Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. The government will call him to provide general background information on Hezbollah and that group's "longstanding presence in South America and its efforts to secure financing, recruit operatives and conduct terrorist attacks . . . ." (Docket Entry No. 211, at 1.) The government further intends to question Mr. Levitt on Adnan Shukrijumah, "an al Qaeda operative of Guyanese nationality" with a "reputation in the Caribbean region as an influential terrorist operative . . . ." (*Id.* at 2.) Mr. Levitt is further expected to "define certain foreign language terms relating to Islamist terrorism, such as 'jihad.'" (Docket Entry No. 227, at 2.) The basis for Mr. Levitt's purported expertise is his experience in the field of counterterrorism and intelligence, and "his academic writings on these subjects." (Docket Entry No. 211, at 1.)

The government's second proposed expert, Calvin Bennett, "is a retired police officer of the Special Branch of the Trinidad and Tobago Police Service, who spent a substantial portion of his career investigating JAM." (*Id.* at 2.) This experience serves as the basis for Mr. Bennett's purported expertise regarding JAM and Abu Bakr. The government intends to elicit testimony from Mr. Bennett regarding JAM's general background and history. (Docket Entry No. 227, at 3.) The government also intends to call him as a fact witness, "regarding his participation in the

execution of a search warrant at the residence of . . . Khalid Hassan . . . ."[4] (Docket Entry No. 195, at 2.)

With respect to the relevance of this evidence, the government states:

> The subjects of the proposed expert testimony in this case are terrorist organizations and individuals to whom the defendants considered presenting their plan to blow up JFK Airport. . . . The fact that the defendants wanted to present their plot to organizations and operatives with a well-established history of participating in international terrorist activities demonstrates the seriousness of their intent to have their plot succeed and undermines any claim that the defendants' statements are just talk. Each of the organizations and individuals which form the subject of the government's proposed expert testimony are referenced by one or more of the defendants over the course of the charged plot. The government will establish those references at trial through recordings of the defendants' conversations, witness testimony, and physical and documentary evidence recovered from the defendants and their homes.

(Docket Entry No. 227, at 9–10.)

Defendants object to the proposed expert testimony on three grounds.[5] First, they challenge the reliability of both witnesses on the ground that their proposed testimony is "not based on sufficient facts or data and is not the product of reliable principles and methods." (Docket Entry No. 220, at 2.) Specifically, they claim that "Mr. Levitt's knowledge is based in large part on hearsay, [and] gathering and analyzing information from multiple sources." (*Id.* at 3.) Defendants further claim that, because he "works collaboratively with his peers and relies upon original information provided directly by other individuals," Mr. Levitt's methodology is unreliable. (*Id.*) Defendants similarly contest the reliability of Mr. Bennett's proposed testimony,

---

[4] The Trinidadian police executed a search warrant for Mr. Hassan's residence in that country, following the arrest of three of the defendants there. *See Defreitas*, 2010 WL 1223244, at *1.

[5] In addition to these three grounds, defendants also state that "there is no indication what [Mr. Levitt's] opinions are or what bases or reasons may support them." (Docket Entry No. 220, at 2.) This concern is mooted by the government's proffer that it does not intend to elicit any opinions from its experts, and instead intends to elicit only background information regarding the aforementioned groups and persons. (*See* May 7, 2010 Status Conference Tr. 23.)

on the ground that he "has no special knowledge, training, education, or experience relating to terrorism or JAM . . . ." (*Id.*)

Defendants' second objection is that the proposed testimony is beyond the scope of Federal Rule of Evidence 702. Specifically, they claim that "the nature, structure, methods and means of al Qaeda [and Hezbollah] are well known to the layperson." (*Id.* at 2.) Defendants claim that the testimony of Mr. Bennett in particular would be beyond the scope of Rule 702, in light of the government's proposal to elicit from him both factual and expert testimony. (*See* Docket Entry No. 221, at 3–4.)

Defendants' third and final objection is that any probative value of the proposed expert testimony is substantially outweighed by the danger of undue prejudice, as set forth in Federal Rule of Evidence 403. (Docket Entry No. 220, at 4; *see also* Docket Entry No. 221, at 2.) Regarding prejudice, defendants claim that "[t]estimony about . . . Hezbollah and al Qaeda[] is highly inflammatory," and "testimony about the role [of] individuals such as Adnan Shukrijumah . . . will only confuse the issues, or mislead the jury." (Docket Entry No. 220, at 4.) Regarding probative value, defendants contend that the proposed testimony "can have no bearing on proving any material fact relevant to [their] alleged guilt," in light of the government's proffer that it does not intend to elicit testimony regarding whether JAM would ultimately have been capable of supporting defendants' alleged plan. (*Id.* at 2–3; *see also* Docket Entry No. 221, at 2–3.) All three of these objections are overruled, as discussed in more detail below.[6]

---

[6] It is worth noting at the outset that other Circuits have rejected similar challenges to the expertise of Mr. Levitt, in cases where he has been called to provide expert testimony on the very matters for which the government has called him at bar. *See, e.g., United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1097 (2005).

A.  **Legal Standards for Notice and Admissibility of Expert Testimony**

"At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial." FED. R. CRIM. P. 16(a)(1)(G). "[This] summary . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.* The purpose of this rule is to "provide the opponent with a fair opportunity to test the merit of the expert's opinion through focused cross-examination." *United States v. Cruz*, 363 F.3d 187, 196 n.2 (2d Cir. 2004).

Federal Rule of Evidence 702, which covers the admission of expert testimony, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of [this] Rule are satisfied, the district court is the ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations and internal quotation marks omitted). The court must therefore "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The court has broad discretion to make both determinations. *See Kumho Tire Co., LTD v. Carmichael*, 526 U.S. 137, 142 (1999); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993).

B.  **Analysis**

   1.  **Reliability of Experts' Proposed Testimony**

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142. "Where, as here, the proposed expert testimony is not of a technical nature, but rather falls within the ambit of social science . . . [a] [c]ourt's task is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Paracha*, 2006 WL 12768, at *19 (S.D.N.Y. Jan. 3, 2006) (citations and internal quotation marks omitted). A court need not "mechanically" apply the factors set forth in *Daubert* in performing this task. *Id.* (citing *Kumho Tire*, 526 U.S. at 152).

Here, the court has carefully examined Mr. Levitt's *curriculum vitae*, which outlines over a decade of relevant teaching positions, policy work, and advisory experience, as well as numerous advanced degrees in the fields of terrorism and international relations. (*See generally* Docket Entry No. 227, Ex. A.) With respect to defendants' objections, the mere fact that a witness works collaboratively, or that his experience consists mainly of publishing academic papers, does not diminish his reliability. *See Paracha*, 2006 WL 12768, at *20 (collecting cases). Furthermore, the use of secondary sources or hearsay to form the bases of a witness's expertise is valid. *See id.* at *21 (citing *United States v. Daly*, 842 F.2d 1380, 1387 (2d Cir. 1988)). Accordingly, the court is satisfied that his proffered testimony will be based on a high level of "intellectual rigor." *See Paracha*, 2006 WL 12768, at *19. With respect to Mr. Bennett, defendants' contention that he has no "special knowledge" of JAM (Docket Entry No. 220, at 3) is disproved by the government's submissions. Mr. Bennett's investigations of JAM's Trinidadian activities over the course of many years (*see* Docket Entry No. 227, at 7; *see also id.*

12

Ex. B) is precisely the type of personal experience that may demonstrate the reliability of non-technical expertise. *See Paracha*, 2006 WL 12768, at *19.

In sum, based on the parties' filings to date, the court finds the proffered testimony of both witnesses to be sufficiently reliable. *See United States v. Williams*, 506 F.3d 151, 160–61 (2d Cir. 2007) (upholding decision to forego *Daubert* hearing where government provided "exhaustive foundation" for witness's expertise). This decision is without prejudice, and defendants are free to renew their challenge to the admissibility of either witness's testimony via *voir dire* at trial. Furthermore, defendants may of course cross-examine both witnesses as to the substance of their testimony.

### 2. Scope of Experts' Proposed Testimony

District courts have broad discretion to determine whether testimony falls within the liberal scope of Federal Rule of Evidence 702. *See United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003) (citations omitted). The determination requires "a common sense inquiry into whether the untrained layman would be qualified to determine intelligently . . . the particular issue without enlightenment from those [with] specialized understanding of the subject . . . ." *Locascio*, 6 F.3d at 936 (citations and internal quotation marks omitted).

Having conducted such an inquiry here with respect to both witnesses, the court finds that the nature, structure, methods, and means of al Qaeda, Hezbollah, and JAM are not subjects about which the average layperson is familiar. While the average layperson may likely be aware of al Qaeda's existence and its use of terrorist tactics to pursue its goals, it is doubtful that the average layperson is similarly familiar with that group's internal structure, or the fact that it has any presence in South America. Laypersons are likely to know even less about Hezbollah, given that it is not linked, as is al Qaeda, to the attacks of September 11, 2001. It is highly unlikely that

the average layperson has even heard of JAM, and even less likely that laypersons would be familiar with its leadership, structure, or history. In sum, because the proposed testimony could assist the jury in understanding the evidence presented, it is admissible as expert testimony. *See* FED. R. EVID. 702.

As a final note, the fact that Mr. Bennett is a law enforcement officer does not place his proposed testimony on JAM beyond the scope of Rule 702. *See United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008) (law enforcement officers may provide expert testimony regarding groups which they have investigated). Furthermore, defendants' objection to his proposed "dual testimony" is unfounded. As the government correctly states, the Federal Rules of Evidence specifically allow for a single witness to provide both factual and expert testimony. *See United States v. Barrow*, 400 F.3d 109, 124 (2d Cir. 2005). Any impact the classification of expert may have is mitigated by the government's proffer that Mr. Bennett's factual testimony, should it even be necessary, will be limited to his very minor role in the seizure of evidence belonging to defendant Kadir, and will be further mitigated by the limiting instructions the court will provide. (*See* Docket Entry No. 227, at 13); *Defreitas*, 2010 WL 1223244, at *1.

### 3. Probative Value Outweighs Danger of Unfair Prejudice

"As with any other relevant evidence, the court should exclude expert testimony if its prejudicial effect substantially outweighs its relevance." *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (citing FED. R. EVID. 403). "Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (citation omitted).

Here, the government has clearly demonstrated the relevance of the proposed expert testimony, as it is probative of the intent element of the charged conspiracies. (*See* Docket Entry No. 227, at 9–10.) The fact that the full probative value of the proposed expert testimony may only be fully realized when it is linked to other evidence is of no moment. Similarly, the fact that defendants are not alleged to have been members of the groups in question is irrelevant. The government's allegation is that defendants intended to obtain support from these groups, and/or identified with their goals. These allegations are neither confusing nor misleading. Evidence that these groups have a history of supporting causes similar to the conspiracies charged here is probative to proving this allegation at trial.

Defendants have failed to demonstrate to the court's satisfaction how any prejudice that could possibly result from the introduction of the proposed expert testimony outweighs its probative value. Beyond tending to prove that defendants did in fact intend for their alleged conspiracies to succeed, it is unclear how the proposed testimony would adversely affect them. *See Figueroa*, 618 F.2d at 943. As described above, the evidence is probative of defendants' intent, an issue they have squarely placed in dispute. Furthermore, intent is an element of five of the six charges in the indictment, and, as such, it is admissible on Rule 403 grounds. *See Mulder*, 273 F.3d at 101.

### III.   Disclosure Sought by Defendant Ibrahim

In the context of opposing the government's anonymous jury motion, Defendant Ibrahim requests disclosure of any information in the possession of any U.S. agency or the U.S. intelligence community:

> 1. indicating that neither Yasin Abu Bakr nor JAM posed a meaningful threat to the United States . . . or . . . were likely or capable of carrying out such a threat;
>
> 2. in connection with Yasin Abu Bakr or JAM posing an actual or perceived threat to the United States . . . ;

> 3. [regarding] [a]ny security assessment [of] Bakr ... in connection with the 2009 Summit of the Americas ... ; [and]
>
> 4. tending to undermine allegations of Bakr's or JAM's "pattern of violence and criminality," "international drug trafficking," "kidnapping," "money laundering," "extortion and political corruption," "witness tampering," and "links with Libyan leader Mohamar Qadafi and other Islamic militant organizations" ....

(Docket Entry No. 170, at 6–7.) Ibrahim further contends that because there was "interagency cooperation" in this case, any participating component of the U.S. intelligence community is "subject to the government's *Brady* and Rule 16 disclosure obligations." (*Id.* at 12 (citing FED. R. CRIM. P. 16; *Brady v. Maryland*, 373 U.S. 83 (1963)).) Additionally, via his Reply Memorandum dated April 9, 2010, Ibrahim made the following disclosure requests:

> 5. [a]ny information in the possession of any United States Federal agency or the United States intelligence community indicating that the target of the government's investigation was anyone other than Ibrahim or any other defendant, including Adnan Shukrijumah or any other individual known or suspected to be associated with Al-Qaeda; and
>
> 6. [a]ny information in the possession of any United States Federal agency or the United States intelligence community, indicating that Ibrahim or any other defendant was not capable or likely of participating in or carrying out any of the crimes charged in the indictment, including obtaining funding from individuals and organizations associated with Iran.

(Docket Entry No. 190, at 4–5.) Ibrahim renewed all of these requests in the context of his objection to the government's proposed expert witnesses. (*See* Docket Entry No. 201, at 1.) He renewed them yet again via discrete motion on May 5, 2010. (*See* Docket Entry No. 210.)

As the court grants the anonymous jury request without relying on the government's assertions regarding Abu Bakr and JAM (*see supra* Part I.B), Ibrahim's motion to compel disclosure for the purposes of contesting that request is moot. In the context of Ibrahim's objection to the government's proposed expert witnesses, neither of the witnesses' expertise is based on the information that Ibrahim seeks. (*See generally* Docket Entry Nos. 195, 211 (setting forth bases for witnesses' expertise).) Indeed, neither witness is an employee of the U.S.

government, let alone a member of any U.S. intelligence agency. (*See* Docket Entry No. 227, Exs. A & B (setting forth witnesses' *curricula vitae*).) Thus, Ibrahim's motion is equally moot with respect to the court's decision in Part II, *supra*. Regarding Ibrahim's discrete motion, the court finds that disclosure is not compelled by either Federal Rule of Criminal Procedure 16 or *Brady*, as discussed in more detail below.

### A. Rule 16 Disclosure

Federal Rule of Criminal Procedure 16(a)(1) outlines the items subject to disclosure during criminal discovery. Such items include, *inter alia*, "papers, documents, data, photographs, tangible objects . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and the item is material to preparing the defense . . . ."[7] FED. R. CRIM. P. 16(a)(1)(E). In the context of this Rule, an item is "material" if it "could be used to counter the government's case or to bolster a defense." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (internal citations omitted). "Defense" means "the defendant's response to the Government's case in chief," encompassing only items "which refute the Government's arguments that the defendant committed the crime charged." *United States v. Armstrong*, 517 U.S. 456, 462 (1996) (interpreting predecessor to FED. R. CRIM. P. 16(a)(1)(E)); *cf. United States v. Delia*, 944 F.2d 1010, 1017–18 (2d Cir. 1991) (holding that even government's proposed rebuttal evidence was outside scope of Rule 16). "It is defendant's burden to [show] that the documents sought are material to preparing his defense." *United States v. Giffen*, 379 F. Supp. 2d 337, 342 (S.D.N.Y. 2004) (citation omitted). "[C]onclusory allegations" are "insufficient for this purpose." *Id.*

---

[7] This rule also requires disclosure of items that the government intends to offer as evidence in its case in chief, and items that were obtained from the defendant. FED. R. CRIM. P. 16(a)(1)(E)(ii–iii); *see also United States v. Mantikala*, 934 F.2d 25, 28 (2d Cir. 1991). Neither is applicable here.

Here, Ibrahim argues that "[d]isclosure of information about JAM is . . . necessary [because] the government has placed JAM and its capabilities squarely within its case-in-chief." (Docket Entry No. 210.) In response, the government states:

> The fact that the defendants intended to present their plot to JAM, an organization well-known in the Caribbean region for engaging in terrorist acts, is significant evidence of their criminal intent to conspire to commit terrorist acts against JFK Airport. The government does not, however, intend to elicit testimony on the question of whether . . . Bakr and JAM would ultimately have been interested in, or capable of . . . supporting the defendants' plan. Such evidence is not relevant to the question of the defendants' guilt[, which may be established] if the government proves beyond a reasonable doubt that, *inter alia*, they acted with the *intent* to have their criminal plans succeed.

(Docket Entry No. 214, at 3 (emphasis added) (citation omitted).) At the status conference held on May 7, 2010, Ibrahim replied via counsel that "[t]he correctness and the accuracy of any defendant's individual perception of JAM and its capacities relates . . . to any defense that we might raise." (Tr. 12.) Pressed to elaborate, he argued that the discovery he sought:

> would go to [each] individual defendant's perception of reality and how other people would see that defendant and that's particularly important in this case because here we're dealing with people who are moving around in foreign arenas and if they have a particular idea of what JAM is and what JAM is capable of but the local people have a completely different perspective on it, then we are entitled to go into that and to preclude us from reviewing any material that would be relevant to that defense would essentially preclude that defense.

(*Id.* at 13.)

Ibrahim's argument appears to be that evidence of JAM's inability or unwillingness to assist the defendants in executing the alleged plot constitutes a defense to the crimes charged— an argument the court finds unpersuasive. It is well established that "factual impossibility is not a defense to an inchoate offense such as conspiracy or attempt." *United States v. Rehak*, 589 F.3d 965, 971 (8th Cir. 2009) (citations omitted); *see also United States v. Tribble*, 320 F. App'x 85, 97 (2d Cir. 2009) (applying same in context of Hobbs Act conspiracy). The documents sought by

18

Ibrahim cannot "counter the government's case" or "bolster a defense," *Stevens*, 985 F.2d at 1180, because, having nothing to do with the issues of whether defendants entered into the alleged agreements, or did so knowingly and intentionally, the information sought cannot "refute the Government's arguments that the defendant[s] committed the [conspiracy] crime[s] charged." *Armstrong*, 517 U.S. at 462. In sum, Ibrahim has failed to meet his burden of showing why the documents sought are "material" to his "defense." FED. R. CRIM. P. 16. Accordingly, the court declines to order their disclosure pursuant to that rule. *See Giffen*, 379 F. Supp. 2d at 342.

## B. *Brady* Disclosure

"[T]he Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Brady*, 373 U.S. at 87). "[T]he prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different. *Id.* at 142. "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982). Thus, the scope of the government's disclosure requirements do not extend to "its investigative files merely because they contain information which could assist the defendant." *United States v. Reddy*, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002); *see also Coppa*, 267 F.3d at 146 ("[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant.").

The government has proffered that "it has searched intelligence files containing threat assessments regarding the defendants' plot and those files contain neither *Brady* material pertaining to JAM nor analysis of JAM's potential strategic and/or operational efforts in the defendants' plot to blow up JFK Airport." (Tr. 11.) The court accepts this proffer, while reminding the government "of its duty to timely provide such information at the risk of depriving [d]efendant[s] of due process of law, requiring a reversal of any conviction obtained." *United States v. Nguyen*, 2007 WL 1111237, at *3 (W.D.N.Y. Apr. 13, 2007). As a final note, the court disagrees with Ibrahim's position that the government's proffer "itself is *Brady* material." (Tr. 11.) As discussed in Part III.A, *supra*, neither JAM's capabilities nor its intentions are relevant to the question of *defendants'* intent, and such information is therefore incapable of exculpating the defendants. *See Brady* 373 U.S. at 87; *LeRoy*, 687 F.2d at 619. Regarding possible impeachment, the government is of course bound by its duty to timely disclose § 3500 material.

## CONCLUSION

For the reasons set forth above, the government's request for certain protective measures, including an anonymous and semi-sequestered jury, is granted in its entirety. Defendants' motion for an evidentiary hearing on the matter is denied. Defendants' objections to the government's proposed expert witnesses are overruled. Ibrahim's motion to compel disclosure of certain intelligence material is denied.

SO ORDERED.

Dated: Brooklyn, New York
January 31, 2011
(*nunc pro tunc* to June 2, 2010)

/s/
_____
DORA L. IRIZARRY
United States District Judge